# NO. 12-13-00101-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *HERITAGE AT LONGVIEW HEALTHCARE CENTER, APPELLANT* | § | *APPEAL FROM THE 188TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *BETTY FITZGERALD, INDIVIDUALLY, AND FOR THE BENEFIT OF ALL WRONGFUL DEATH BENEFICIARIES OF JAMES ROBERT FITZGERALD, APPELLEE* | § | *GREGG COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Heritage at Longview Healthcare Center, HCRI Texas Properties, Ltd. d/b/a Heritage at Longview Healthcare Center, and IHS Acquisition No. 138, Inc. d/b/a Horizon Healthcare Center at Longview (collectively Heritage) appeal the denial of their motion to dismiss with prejudice the claims of Betty Fitzgerald, individually and for the benefit of all wrongful death beneficiaries of James Robert Fitzgerald (Betty), due to deficiencies in her expert report. In one issue, Heritage contends that the trial court's order constitutes reversible error because Betty's expert witness is not qualified and the expert report fails to meet the requirements of Texas Civil Practice and Remedies Code, Section 74.351. We reverse and remand.

## BACKGROUND

Late in his life, James Fitzgerald suffered many maladies, including senile dementia, and required significant medical assistance. He lived at Heritage, a nursing home in Longview, Texas.

As James's health deteriorated, Heritage implemented a number of "interventions" to address his mobility assistance, fall injury prevention, and safety while in bed. Even with these

interventions, James fell several times during the last few weeks of his life. On August 15, 2009, James was found lying on the bathroom floor. He had fallen while going to the bathroom and suffered chest wall and scalp contusions. On September 1, 2009, James again fell and injured his right foot. A few hours later, on September 2, 2009, a nurse found James crawling on the floor in his room. In response to these falls, Heritage provided James with a bedside urinal.

Early on the morning of September 13, 2009, James was walking in his room when he became weak, lost his balance, and fell on his left side. During the fall, James also hit the back of his head on the door to his room. In response, Heritage told James to wait for assistance from the staff, use the call light button, and use the wheelchair to ambulate. A few hours later, a nurse found James lying on the bathroom floor. He had fallen again, and this time, he had injured his left elbow. The next day, a nurse found James in a confused state, sitting on the floor in his room. As a result, a physician ordered a "personal alarm" for James's safety. However, because he suffered a subdural hematoma as a result of his fall on September 13, James died on September 17, 2009.

Betty, James's widow, filed this health care liability suit,[1] alleging that Heritage was negligent in its treatment of her husband. Specifically, she alleged that Heritage should have done more to prevent James's falls. Betty sought to comply with the expert report requirements in health care liability suits by filing an expert report from Joe B. Ventimiglia, M.D., Ph.D.[2] Heritage filed a motion to dismiss, challenging Dr. Ventimiglia's qualifications as well as his opinions on standard of care and causation. The trial court denied Heritage's motion to dismiss, and this interlocutory appeal followed.[3]

## ADEQUACY OF EXPERT REPORT

In its sole issue, Heritage argues that the trial court abused its discretion when it denied Heritage's motion to dismiss Betty's health care liability claim against it because Betty failed to provide an adequate expert report.

## Standard of Review

We review a trial court's ruling on a Section 74.351 motion to dismiss for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex.

---

[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13) (West Supp. 2012).

[2] *See generally* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 (West 2011).

[3] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(9) (West Supp. 2012) (allowing interlocutory appeal from denial of a motion to dismiss under Section 74.351(b)).

2001).  A trial court abuses its discretion if it acts in an unreasonable or arbitrary manner, without reference to any guiding rules or principles.  *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003).  A trial court acts arbitrarily and unreasonably if it could have reached only one decision, but instead reached a different one.  *See Teixeira v. Hall*, 107 S.W.3d 805, 807 (Tex. App.–Texarkana 2003, no pet.).  To that end, a trial court abuses its discretion when it fails to analyze or apply the law correctly.  *In re Sw. Bell Tel. Co.*, 226 S.W.3d 400, 403 (Tex. 2007) (citing *In re Kuntz*, 124 S.W.3d 179, 181 (Tex. 2003)).

**Applicable Law**

To qualify as an expert witness on the issue of whether a health care provider departed from the accepted standards of care, a witness must (1) practice health care in a field of practice that involves the same type of care or treatment as that delivered by the health care provider, if the health care provider is an individual, at the time the testimony is given, or was practicing that type of health care when the claim arose, (2) have knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim, and (3) qualify on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b) (West 2011).  To determine whether a witness is qualified, we consider whether the witness is (1) certified by a state licensing agency or national professional certifying agency or has other substantial training or experience in the area of health care relevant to the claim and (2) actively practicing health care in rendering health care services relevant to the claim.  *See id*. § 74.402(c).  We also examine the witness's report and curriculum vitae in making this assessment.  *See Caviglia v. Tate*, 365 S.W.3d 804, 810 (Tex. App.–El Paso 2012, no pet.).  Not every licensed doctor is qualified to testify on every medical question, but we must be careful not to draw expert qualifications too narrowly.  *Adeyemi v. Guerrero*, 329 S.W.3d 241, 247 (Tex. App.–Dallas 2010, no pet.).

An "expert report" is a written report that provides a fair summary of the expert's opinions regarding applicable standards of care, the manner in which the defendant failed to meet those standards, and the causal relationship between the defendant's failure and the plaintiff's injury, harm, or damages claimed.  TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (West 2011).  "A report that satisfies these requirements, even if as to one theory only, entitles the claimant to proceed with a suit against the physician or health care provider."  *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013).  In setting out the expert's opinions on each of the required

elements, the report must provide enough information to fulfill two purposes if it is to constitute a good faith effort. *Palacios*, 46 S.W.3d at 879. An objective good faith effort to comply with the statute is made if the report (1) informs the defendant of the specific conduct that the plaintiff has called into question and (2) allows the trial court to conclude that the claim has merit. *Id*. A report that merely states the expert's conclusions about the standard of care, breach, and causation does not provide the necessary information to fulfill the dual purposes. *Id*. Rather, the expert must explain the basis of his statements in a way that links his conclusions to the facts. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). A "fair summary" is not a conclusory summary. *Id*. at 53. In our review of an expert report, we are limited to the report's contents, contained within the four corners of the report, in determining whether the report manifests a good faith effort to comply with the statutory definition of an expert report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(*l*); *Palacios*, 46 S.W.3d at 878.

The standard of care for a nursing home is what an ordinarily prudent nursing home would do under the same or similar circumstances. *See Palacios*, 46 S.W.3d at 880. An expert's report must put the defendant on notice of the complained-of conduct and what it should have done differently. *See id*. It should state clearly the care that was expected, but not given. *Id*. "It is not sufficient for an expert to simply state that he or she knows the standard of care and concludes it was [or was not] met." *Id*. (quoting *Chopra v. Hawryluk*, 892 S.W.2d 229, 233 (Tex. App.–El Paso 1995, writ denied)).

A causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm and that, absent this act or omission, the harm would not have occurred. *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App.–San Antonio 2004, no pet.). Merely providing some insight into the plaintiff's claims does not adequately address causation. *Wright*, 79 S.W.3d at 53. Accordingly, causation cannot be inferred; it must be clearly stated. *Castillo v. August*, 248 S.W.3d 874, 883 (Tex. App.–El Paso 2008, no pet.). We may not fill in gaps in a report by drawing inferences or guessing what the expert meant or intended. *See Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.–Austin 2007, no pet.).

Finally, a plaintiff need not present evidence in the report as if it were actually litigating the merits. *See Palacios*, 46 S.W.3d at 879. The report can be informal, meaning that it does not have to meet the same requirements as the evidence offered in a summary judgment proceeding or at trial. *Id.*

4

**Expert Qualifications**

In the first part of its sole issue, Heritage argues that Dr. Ventimiglia is not qualified to provide an expert opinion that Heritage departed from the accepted standard of care. Specifically, Heritage contends that Dr. Ventimiglia failed to demonstrate that he has any (1) nursing home training or experience or (2) knowledge of the accepted standard of care for nurses for the diagnosis, care, or treatment of patients in a nursing home.

In his report, Dr. Ventimiglia states that he is a Texas-licensed physician with special experience and interest in the care of geriatric patients and the homebound chronically ill. His report further states that he is involved in the hospice care of several patients. He claims experience caring for hundreds of nursing home patients in his career, including several nursing home patients at the time that he wrote his expert report. He further relates that he has experience in the supervision and management of patients in a nursing home setting who are at risk for falls.

Furthermore, Dr. Ventimiglia's curriculum vitae sets forth his expertise and training as it relates to care of the elderly. It indicates that he has an extensive home visit practice as well as several decades of experience in family practice.

Based on our review of Dr. Ventimiglia's expert report and curriculum vitae, we conclude that the trial court did not abuse its discretion when it found Dr. Ventimiglia qualified to render an opinion that Heritage deviated from the standard of care in its treatment of James. The record reflects that Dr. Ventimiglia has experience treating nursing home patients. And although his experience may not be as extensive as Heritage would prefer, we are mindful that we must not draw expert qualifications too narrowly. *Adeyemi*, 329 S.W.3d at 247.

**Standard of Care**

In the second part of its sole issue, Heritage contends that Dr. Ventimiglia failed to adequately express an opinion regarding (1) the standard of care owed to James and (2) Heritage's failure to meet that standard of care as it related to its treatment of him.

Dr. Ventimiglia states, "Staff at skilled nursing facilities are required to provide a safe environment for their patients." He explained that this includes their regularly assessing a patient for fall risk and applying interventions such as low beds, bed and chair alarms, and soft mats around beds to reduce or eliminate fall risks and injuries in the event a fall occurred. He further asserts that Heritage failed to meet the standard of care because it (1) failed to regularly assess James for a fall risk and (2) failed to respond to James's increased frequency of falls with the implementation of timely, effective fall prevention mechanisms.

5

By stating that Heritage had a duty to regularly assess James for fall risk, but that it failed to perform these assessments, Dr. Ventimiglia adequately expressed an opinion concerning both the standard of care owed to James and Heritage's failure to meet that standard. Therefore, we conclude that Betty gave Heritage notice of the conduct complained of and what it should have done differently. *See Palacios*, 46 S.W.3d at 878. Accordingly, we hold that, because Betty provided an expert report that satisfies the standard of care requirement, Heritage failed to demonstrate that she is not entitled to proceed with a suit against it on this basis. *See Certified EMS, Inc.*, 392 S.W.3d at 630.

**Causation**

In the third part of its sole issue, Heritage argues that Dr. Ventimiglia's report does not satisfy the statutory requirements for expressing an opinion on causation.

It is apparent that, based on Dr. Ventimiglia's assessment in his report, Heritage should have provided additional safeguards for James to prevent him from falling or reduce his risk of injury in the event of a fall such as fall mats, a chair alarm, and a bed alarm. But Heritage's failure to implement these changes was not necessarily a substantial factor in James's death. *See Costello*, 141 S.W.3d at 249. In other words, the crucial component of the causation analysis is whether James would not have fallen and hit his head on his door if Heritage had added fall mats, a chair alarm, and a bed alarm. *Id*.

In her brief, Betty contends in a conclusory fashion that the injuries James sustained in the falls caused his death, and fall mats, chair alarms, and bed alarms would have prevented the falls. She cites to Dr. Ventimiglia's report, which is similarly conclusory on this point. With regard to causation, Dr. Ventimiglia states that "[i]n the absence of the negligent failure of [Heritage's] staff in their failure to implement timely, effective fall prevention interventions such as floor mats [and] bed and chair alarms, [James] would have, in all reasonable medical probability, been able to safely ambulate and transfer throughout his stay at Heritage." He summarizes his opinion on causation by claiming that Heritage's negligence was the direct and proximate cause of James's injuries.

However, Dr. Ventimiglia's report fails to demonstrate how Heritage's negligence caused James's death. *See Wright*, 79 S.W.3d at 53. Fall mats cushion a fall when a patient hits the floor. But James's death appears to have been caused when the back of his head struck the door to his room. Dr. Ventimiglia's report does not indicate how floor mats would have prevented that injury. Similarly, with regard to the chair and bed alarm, Dr. Ventimiglia does not indicate that a nurse would have had time to enter James's room before he fell. In fact, there is no evidence of how

6

quickly James made his way to the door and fell or how quickly a nurse should be required to check on a patient when a chair or bed alarm is activated. Consequently, we cannot determine whether Heritage's alleged negligence was a substantial factor in James's death. *See id.*; *see also Ortiz v. Patterson*, 378 S.W.3d 667, 674 (Tex. App.–Dallas 2012, no pet.) (expert witness must explain how alleged breach of care caused injury, not merely conclude that it did).

We recognize that Betty is not required to marshal all of her proof as if she were actually litigating her claim. *See Palacios*, 46 S.W.3d at 879. Nonetheless, we conclude that Dr. Ventimiglia's report is inadequate because it is conclusory on the element of causation. *See Wright*, 79 S.W.3d at 53; *Patterson*, 378 S.W.3d at 674. Therefore, we hold that the trial court abused its discretion when it overruled Heritage's motion to dismiss.

Heritage's sole issue is sustained in part and overruled in part.

## DISPOSITION

We have sustained Heritage's sole issue in part and overruled it in part. Having done so, we *reverse* the trial court's order denying Heritage's motion to dismiss and *remand* the cause to the trial court for further proceedings consistent with this opinion, including its consideration of whether Betty is entitled to a thirty day extension to amend her timely, but deficient expert report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c); *Leland v. Brandal*, 257 S.W.3d 204, 207–08 (Tex. 2008).

**BRIAN HOYLE**
Justice

Opinion delivered August 7, 2013.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)

7



# COURT OF APPEALS

## TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**AUGUST 7, 2013**

## NO. 12-13-00101-CV

**HERITAGE AT LONGVIEW HEALTHCARE CENTER,**
Appellant
V.
**BETTY FITZGERALD, INDIVIDUALLY AND FOR THE
BENEFIT OF ALL WRONGFUL DEATH BENEFICIARIES,**
Appellee

Appeal from the 188th Judicial District Court
of Gregg County, Texas. (Tr.Ct.No. 2011-2502-A)

THIS CAUSE came to be heard on the appellate record and the briefs filed herein, and the same being considered, because it is the opinion of this court that there was error in the judgment of the court below, it is ORDERED, ADJUDGED and DECREED by this court that the judgment be **reversed** and the cause **remanded** to the trial court **for further proceedings** and that all costs of this appeal are hereby adjudged against the Appellee, **BETTY FITZGERALD, INDIVIDUALLY, AND FOR THE BENEFIT OF ALL WRONGFUL DEATH BENEFICIARIES OF JAMES ROBERT FITZGERALD**, in accordance with the opinion of this court; and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*