**AFFIRMED and Opinion Filed December 3, 2019**



In the
# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-19-00378-CV

### METHODIST RICHARDSON MEDICAL CENTER, Appellant
### V.
### TINA CELLARS, Appellee

**On Appeal from the 101st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-18-09173**

## MEMORANDUM OPINION

Before Justices Pedersen, III, Reichek, and Carlyle
Opinion by Justice Carlyle

Methodist Richardson Medical Center appeals from the trial court's order overruling its objections and denying its motion to dismiss under § 74.351 of the Texas Civil Practice and Remedies Code. Methodist contends the trial court erred in concluding Tina Cellars satisfied § 74.351's requirements because her expert reports do not adequately describe how Cellars's injuries were caused by Methodist Richardson's breach of an applicable standard of care. We affirm and, because the legal issues are settled, issue this memorandum opinion. *See* TEX. R. APP. P. 47.4.

### Background

According to her live petition, Cellars received a spinal epidural at Baylor Surgicare in North Garland. Dr. Daniel Sunwoo administered the injection shortly before 1 p.m., after which

Cellars soon began experiencing excruciating pain. Dr. David Metz, an anesthesiologist and the Medical Director at Baylor Surgicare, examined Cellars and, in consultation with Dr. Sunwoo, determined Cellars likely developed a spinal epidural hematoma—a collection of blood on the surface of the spinal cord—as a result of the injection.

Cellars alleged that "the presence of an epidural spinal hematoma on [her] spinal cord was by any reasonable estimation a medical emergency requiring immediate medical treatment." And the only effective treatment was an operation performed by a neurosurgeon. That operation could not be performed at Baylor Surgicare, however, so Drs. Metz and Sunwoo decided to transfer Cellars to Methodist Richardson. An ambulance was called, and emergency responders were informed Cellars likely had an epidural spinal hematoma. The ambulance left Baylor Surgicare around 2:00 p.m.

Upon arrival at Methodist Richardson, Cellars was evaluated by Dr. Geoffrey Wiss, an emergency physician who is not a neurosurgeon. According to Cellars, hospital records indicate Dr. Metz called ahead and told Dr. "Wiss and/or the staff at Methodist Richardson of the probable diagnosis [of an epidural spinal hematoma] and the need for an immediate CT scan to confirm." Records also indicate Dr. Metz asked Dr. "Wiss and/or the staff at Methodist Richardson about the availability of a neurosurgeon to provide the definitive treatment that Ms. Cellars required." But despite having advance warning of Cellars's presumptive diagnosis, neither Dr. Wiss nor Methodist Richardson treated Cellars's condition as an emergency. Instead, they waited approximately an hour and a half before giving her a CT scan, which confirmed the epidural spinal hematoma. At that point, a neurosurgeon, Dr. Gary Dennis, was contacted for the first time.

Dr. Dennis ordered both that Cellars be admitted to Methodist Richardson and that she undergo further imaging. Cellars was given an MRI, more than three and a half hours after she arrived at Methodist Richardson, which again confirmed the epidural spinal hematoma. But Dr.

Dennis did not arrive at the hospital to perform the required surgery for several more hours. At that point, it had been approximately eight hours since Cellars arrived at Methodist Richardson and nearly eleven hours since she began experiencing symptoms of the epidural spinal hematoma.

Cellars asserts she suffered permanent nerve damage because of the delay in her treatment, and her petition alleges claims against the various doctors and entities involved in her care. As it relates to this appeal, the petition claims Methodist Richardson was negligent in failing to adopt or otherwise follow appropriate policies and procedures for responding to patients in need of emergency treatment.

As required by § 74.351 of the Texas Civil Practice and Remedies Code, Cellars timely provided expert reports from Doctors Nancy Epstein, Alan Kaye, and Susan Abookire.[1] Dr. Epstein, a board-certified neurosurgeon, opined on the standard of care applicable to physicians "confronted with a patient who has a presumptive or actual diagnosis of a neurological elective or emergent condition." She explained that a spinal epidural hematoma is "known to cause serious and permanent spinal cord/nerve injury—potentially leading to paralysis or death—if not treated immediately" and that it is "unquestionably a medical emergency which requires immediate treatment by a neurosurgeon." Thus, she opined: "Any physician confronted with a patient who has an actual or presumed spinal epidural hematoma is required by the standard of care applicable to all physicians to treat the patient as requiring immediate neurosurgical care." Yet "none of the doctors responsible for [Cellars's] care treated her condition as an emergency requiring emergent treatment. As a result, the necessary care was delayed until it was too late to avert serious and permanent injury."

Dr. Epstein further explained that Cellars likely would have recovered if the necessary surgery were performed within the first six hours after the injury; "every hour she suffered without

---

[1] Methodist Richardson does not challenge the doctors' qualifications.

surgery after that increased both the amount and permanence of her neurological injury." Consequently, "the delay in treatment caused by the negligence of [the treating physicians] was the 'proximate cause' of severe and permanent injury to Tina Cellars."

With respect to the transfer of treatment from Baylor Surgicare to Methodist Richardson, Dr. Epstein noted that records indicated Dr. Metz both informed Methodist Richardson that Cellars likely had a spinal epidural hematoma and "verified neurosurgical call coverage." It was not clear from the record, however, whether Drs. "Metz or Sunwoo communicated the emergent nature of Ms. Cellars' condition to anyone at Methodist Richardson, or that they communicated that Ms. Cellars required immediate care by a neurosurgeon." Further, the record did not indicate whether Dr. Wiss or "anyone else at Methodist Richardson had made any effort to determine whether in fact there was a neurosurgeon available to attend to Tina Cellars at or shortly after her impending arrival." According to Dr. Epstein, Dr. Wiss was required—based on Cellars's presumptive diagnosis—to ensure a neurosurgeon would be available to treat Cellars "before either accepting the transfer or making any assurances to Drs. Metz or Sunwoo." But Dr. Wiss and Methodist Richardson accepted Cellars's transfer without contacting—much less assuring the availability of—a neurosurgeon.

Dr. Kaye, who is board certified in anesthesiology and pain medicine, has performed injections similar to the one administered to Cellars. He agreed with Dr. Epstein's conclusions concerning the emergent nature of Cellars's condition, its requirement for prompt treatment, and the alleged failings of the various doctors involved in Cellars's care. But Dr. Kaye's report also discusses the policies and procedures at issue with regard to Cellars's transfer from Baylor Surgicare to Methodist Richardson. To that end, he concluded:

> Baylor Surgicare should never have sent Tina Cellars to a facility without being certain that immediate neurosurgery consult was available there. Methodist Richardson should never have accepted the transfer without being equally certain.

–4–

These failures are not only failures of the individuals making, receiving and documenting the calls, but are also systemic policy and procedure failures of the medical facilities involved. If the facilities had in place proper transfer policies and had properly educated their medical personnel and staff on those procedures, the transfer of Tina Cellars from Baylor Surgicare to Methodist Richardson would never have occurred. Ms. Cellars would have been transferred from Baylor Surgicare to one of the hospitals in the Dallas areas [sic] which could and would have provided immediate neurosurgical care, preventing the progression of her hematoma and her eventual permanent injury.

Dr. Abookire is a board-certified internist, an Assistant Professor at Harvard Medical School, and the co-founder of the Harvard Medical School Fellowship in Quality and Patient Safety. Dr. Abookire echoed Dr. Epstein's and Dr. Kaye's conclusions concerning each physician's duty to ensure patients with emergent conditions receive appropriate emergency care. And like Dr. Kaye, she also opined on the deficiencies of Baylor Surgicare's and Methodist's Richardson's policies and procedures regarding the transfer of patients in need of such care.

Dr. Abookire concluded the delay in Cellars's treatment, and thus her injuries, "could not have occurred had Baylor Surgicare and Methodist Richardson Medical Center implemented, . . . taught and applied basic safety procedures to make sure that patients like Tina Cellars would be transferred to a medical facility where appropriate care was available."

She explained that

"[i]t is a basic principle of patient safety that medical facilities must have, teach and enforce policies and procedures requiring that patients in emergency conditions be treated as such, and that every reasonable effort be made to see that patients receive the necessary care without regard to the profits or pre-existing business arrangements of the facility.

To Dr. Abookire, it was "apparent from the record that Baylor Surgicare and Methodist Richardson Medical Center either did not have or did not follow the basic policies and procedures which would have prevented Ms. Cellars' injuries."

With regard to Methodist Richardson specifically, she explained "Methodist Richardson was required to have, teach and enforce policies and procedures concerning when and under what

–5–

circumstances patients such as Tina Cellars can be accepted as patients." And such "policies must clearly require that patients who require emergency surgery cannot be accepted as a transfer unless there is appropriate expertise immediately available to treat the patient." She added that, "[i]f proper procedures were in place and medical staff were trained on them, then Methodist Richardson would have confirmed—by calling the neurosurgeon 'on call'—that a neurosurgeon was actually available to treat Tina Cellars before making any kind of assurance to Baylor Surgicare and the doctors there." Yet "[c]learly such policies didn't exist or were not followed, because the records indicate that Methodist Richardson did not even contact a neurosurgeon until Ms. Cellars had been there for two hours—three hours after the injury occurred and over two hours after telling Baylor Surgicare that a neurosurgeon was available."

Methodist Richardson objected to Cellars's expert reports and moved to dismiss her suit, contending the expert reports failed to outline the applicable standard of care, explain how Methodist Richardson breached that standard, or explain how any breach caused Cellars's injuries. After a hearing, the trial court overruled Methodist Richardson's objections and denied its motion to dismiss.

**Standard of Review**

Chapter 74 of the Texas Civil Practice and Remedies Code requires claimants in health-care-liability cases to serve an expert report on each defendant. TEX. CIV. PRAC. & REM. CODE § 74.351. The purpose of this "requirement is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018). The report must fairly summarize "the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the

causal relationship between that failure and the injury, harm, or damages claimed." Civ. Prac. & Rem. § 74.351(r)(6).

A report is adequate under the statute if it contains sufficient information to inform the defendant of the specific conduct at issue and provide a basis for the trial court to conclude the claims have merit. *Abshire*, 563 S.W.3d at 223. It "need not marshal all of the claimant's proof," nor must it meet the same standards as the evidence offered in a summary-judgment proceeding or trial. *Methodist Hosps. of Dallas* v. *Nieto*, No. 05-18-01073-CV, 2019 WL 6044550, at *7 (Tex. App.—Dallas Nov. 15, 2019, no pet. h.) (mem. op.). But it must offer more than an expert's conclusory statements about the standard of care, breach, and damages. *Abshire*, 563 S.W.3d at 223. In other words, "the expert must explain the basis of his statements to link his or her conclusions to the facts." *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002).

A motion to dismiss based on the inadequacy of a report under Chapter 74 can only be granted "if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply" with the statute's definition of an "expert report." *Id.* § 74.351(l). Multiple reports may be read together to determine whether Chapter 74's requirements have been met, but "[a] court may not 'fill gaps' in an expert report by drawing inferences or guessing what the expert likely meant or intended." *Nieto*, 2019 WL 6044550, at *7. Rather, the court must consider only the information contained within the four corners of the report. *Abshire*, 563 S.W.3d at 223. A trial court's decision to deny a motion to dismiss challenging the adequacy of an expert report is reviewed for abuse of discretion. *Abshire*, 563 S.W.3d at 223.

### Cellars satisfied § 74.351's requirements

Methodist Richardson broadly argues that Cellars's expert reports are deficient because they fail to identify the applicable standard of care, fail to show how that standard was breached, and fail to show how the breach caused Cellars's injuries. More specifically, Methodist Richardson

contends the expert reports are deficient because they: (1) do not identify "facts showing Methodist was involved in Dr. Wiss' decision to accept the care of Cellars from Baylor Surgicare"; (2) do not "identify medical record[s] showing anyone at Methodist was aware of the emergency nature of Cellars' condition"; and (3) "fail to describe an emergency transfer policy that would have prevented Dr. Wiss from accepting Cellars' transfer." We reject each of these contentions.

Methodist Richardson's first contention, that the expert reports fail to identify "facts showing Methodist was involved in Dr. Wiss' decision to accept" Cellars's transfer, misses the point: the experts collectively opined that Methodist Richardson was required to involve itself in the transfer decision (at least indirectly) by adopting and enforcing appropriate policies and procedures governing such decisions to transfer patients to the hospital. It was not necessary for Cellars's experts to identify specific facts showing Methodist Richardson directly participated in Dr. Wiss's decision to accept the transfer.

Likewise, Cellars's experts were not required to cite specific medical records establishing Methodist Richardson's knowledge of Cellars's emergent condition. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001) ("[A] plaintiff need not present evidence in the report as if it were actually litigating the merits."). And we reject Methodist Richardson's flawed assertion that, because the reports acknowledge a lack of clarity in the records with respect to whether Baylor Surgicare clearly communicated the emergent nature of Cellars's condition, the reports thus affirmatively show Methodist Richardson lacked knowledge of the emergent nature of Cellars's condition.

Indeed, as Drs. Epstein and Kaye both point out, Dr. Metz's notes "indicate[] that when he spoke with Methodist Richardson he informed them that Ms. Cellars likely had a spinal epidural hematoma." According to Drs. Epstein and Kaye, "[i]ndications in the record are that Dr. Metz had this conversation with emergency physician Dr. Geoffrey Wiss." And Dr. Wiss, like "[a]ny

physician confronted with a patient who has an actual or presumed spinal epidural hematoma is required by the standard of care applicable to all physicians to treat the patient as requiring immediate neurosurgical care." Dr. Epstein thus concludes that "Dr. Wiss knew of a medical emergency requiring neurosurgical treatment two hours before he called a neurosurgeon about the patient." Dr. Abookire's report does not contradict this conclusion; rather, Dr. Abookire states that, although the record is not clear who at Methodist Richardson received the call concerning Cellars, "it seems likely that Dr. Wiss was at least involved." Collectively, the expert reports provide an adequate factual basis to conclude that Dr. Wiss, an emergency physician at Methodist Richardson, had knowledge of the emergent nature of Cellars's condition before accepting the transfer of her care from Baylor Surgicare.

We also reject Methodist Richardson's assertion that the expert reports are deficient because they "fail[] to provide sufficient detail as to what a policy compliant with her stated standard of care would look like in practice." Cellars's experts were not required to draft a compliant policy for Methodist Richardson or explain how that policy should have been implemented. Rather, the experts were required to fairly summarize their opinions concerning the applicable standard of care. They did that. Dr. Abookire explained that "Methodist Richardson was required to have, teach and enforce policies and procedures concerning when and under what circumstances patients such as Tina Cellars can be accepted as patients." She added that such "policies must clearly require that patients who require emergency surgery cannot be accepted as a transfer unless there is appropriate expertise immediately available to treat the patient."

Dr. Abookire also fairly summarized the basis for her conclusion that Methodist Richardson breached its duty. "If proper procedures were in place and medical staff were trained on them, then Methodist Richardson would have confirmed—by calling the neurosurgeon 'on call'—that a neurosurgeon was actually available to treat Tina Cellars before making any kind of

assurance to Baylor Surgicare and the doctors there." Yet "[c]learly such policies didn't exist or were not followed, because the records indicate that Methodist Richardson did not even contact a neurosurgeon until Ms. Cellars had been there for two hours—three hours after the injury occurred and over two hours after telling Baylor Surgicare that a neurosurgeon was available." Both she and Dr. Kaye opined that Methodist Richardson should never have accepted Cellars's transfer without first determining it had access to immediate neurosurgery expertise.

The expert reports also fairly summarize the causal connection between Cellars's permanent injuries and Methodist's failure to adopt, teach, and enforce appropriate policies and procedures. Dr. Epstein stated that doctors have a six-hour window within which to operate on a patient with a spinal epidural hematoma to likely avoid permanent injury or death. Dr. Abookire explained that the approximately eleven-hour delay before Cellars's surgery, and thus her permanent injuries, "could not have occurred had Baylor Surgicare and Methodist Richardson Medical Center implemented, . . . taught and applied basic safety procedures to make sure that patients like Tina Cellars would be transferred to a medical facility where appropriate care was available."

Methodist Richardson nevertheless contends the reports are deficient because they do not specify how the contemplated emergency-transfer policy would have altered Dr. Wiss's medical decision to accept Cellars's transfer from Baylor Surgicare. That is, Methodist Richardson asserts Dr. Wiss simply could have ignored Methodist Richardson's policies and procedures in the exercise of his own medical judgment. But the purpose of the expert-report requirement is to weed out frivolous claims, not adjudicate potentially meritorious claims. *See Abshire*, 563 S.W.3d at 223.

It is not frivolous to suggest the extent to which Methodist Richardson adopted, taught, and enforced appropriate transfer policies would have influenced Dr. Wiss's decision to accept

–10–

Cellars's transfer at its hospital. In any event, an expert report is not required "to anticipate and rebut all possible defensive theories that may ultimately be presented to the trial court, and the fact a plaintiff may not prove causation at trial does not mean an expert report was inadequate." *Fortner v. Hosp. of the Sw., LLP*, 399 S.W.3d 373, 383 (Tex. App.—Dallas 2013, no pet.). If Methodist Richardson contends Dr. Wiss would have accepted Cellars's transfer no matter what policies and procedures it implemented, it will have the opportunity to present evidence supporting that theory. At this stage in the proceedings, this defensive theory does not render Cellars's claims frivolous.

Cellars's expert reports link the facts they describe to their opinions that Methodist Richardson's failure to adopt, teach, or enforce an appropriate emergency-transfer policy contributed to the delay in Cellars's treatment and her permanent neurological injury. The reports sufficiently inform Methodist Richardson of the specific conduct at issue and provide a basis for the trial court to conclude her claims have merit. That "is all that is required of an expert report." *Adeyemi v. Guerrero*, 329 S.W.3d 241, 246 (Tex. App.—Dallas 2010, no pet.).

We affirm.

/Cory L. Carlyle/
CORY L. CARLYLE
JUSTICE

190378F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

METHODIST RICHARDSON MEDICAL
CENTER, Appellant

No. 05-19-00378-CV     V.

TINA CELLARS, Appellee

On Appeal from the 101st Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-18-09173.
Opinion delivered by Justice Carlyle.
Justices Pedersen, III and Reichek
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

It is **ORDERED** that appellee TINA CELLARS recover her costs of this appeal from
appellant METHODIST RICHARDSON MEDICAL CENTER.

Judgment entered this 3rd day of December, 2019.